# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kristin Bailey ) | |
| ) | CASE NO: |
| Plaintiff, ) | |
| ) | |
| v. ) | COMPLAINT |
| ) | |
| National Enterprise Systems, Inc. ) | |
| ) | |
| Defendant. ) | **JURY TRIAL DEMANDED** |

## INTRODUCTION

1. This is an action for damages brought by Kristin Bailey ("Kristin") to redress the Defendant's violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA").

2. The FDCPA prohibits debt collectors from engaging in abusive, deceptive and unfair practices in their collection of consumer debts.

## JURISDICTION/VENUE

3. Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d).

4. Venue is proper in this District because the acts and transactions occurred here, Kristin resides here, and Defendant transacts business here.

## PARTIES

5. Kristin is an adult individual who resides in the City of Elizabeth, County of Allegheny, Commonwealth of Pennsylvania, and is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3).

6. Defendant National Enterprise Systems, Inc. ("NES") is a foreign corporation and a collection agency operating from an address of 29125 Solon Road, Solon, Ohio 44139, and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

## **NES TRAINING/COMMON PRACTICES**

7. In addition to the initial FDCPA compliance training Defendant provides its employees, subsequent training teams and supervisors teach and encourage NES employees to engage in nearly identical unlawful conduct as alleged below, including but not limited to the following deceptive and unfair collection practices: (a) threatening lawsuits and garnishment; and (b) threatening service of nonexistent summons.

8. Upon information and belief:

(a) NES has a training segment called Beth's Collection Team wherein employees are trained to use false names, to raise their voices to alleged debtors who dispute debts or refuse to pay, and to make statements such as "disputes are not my concern" and "you need to dispute with the credit bureaus and quit lying about your money",

(b) NES supervisors teach employees that threatening to lien someone's property and to garnish wages, even where not permitted by law and NES has no intention of doing so, are effective means for securing payment of debts,

(c) NES trains and encourages its employees to make statements to alleged debtors such as they are calling from the clerk's office of the debtor's county court, implying that a lawsuit was commenced against the debtor,

(d) NES trains and encourages employees to make statements such as "to stop any legal action you need to provide me with your checking account number and the name of your bank to show my boss that you're serious.," where NES has no authority to or intention of pursuing litigation against the particular debtor,

(e) NES trains and encourages its employees to make phony collection log entries, or to omit log entries altogether, for telephone calls made in which it was aware its employees violated or likely violated the FDCPA in order to frustrate discovery of those violations in subsequent lawsuits,

(f) NES trains and encourages its employees to make telephone calls to debtors and non-debtors alike demanding immediate payment during the validation period required by 1692 of the FDCPA, 15 U.S.C. § 1692g,

(g) NES' collectors omit the warning required by 15 U.S.C. § 1692e(11) from their collection calls,

(h) NES has an undocumented policy of encouraging its employees to refer to "case numbers" for non-existent lawsuits and to dress up an NES account number with the first few letters of a debtor's name, part of the debtor's birth date, or the abbreviation of the debtor's home state in order to do so,

(i) NES supervisors train employees to use legal jargon to refer to a "case currently pending in this office for litigation," and to represent that NES is "prepared to take any action within the law of the state you live in to collect this money",

(j) NES trains and encourages its employees to routinely violate the FDCPA, how to do it, and how to cover it up in NES' collection notes both to protect against subsequent lawsuits and to protect valuable NES clients from learning of NES' collection methods,

(k) The practice of leading debtors to believe NES is a law office was common among NES collectors and encouraged by supervisors.

9. All of these strategies are used by NES to extract payment of sums whether or not the consumer owes them. All of these strategies are unlawful under the FDCPA. A review of the US Party Index reveals that NES has been sued many times in the last several years for similar or nearly identical alleged unlawful conduct.

10. NES has a longstanding pattern and practice of misrepresenting to consumers that lawsuits and garnishment proceedings are pending or will be filed if a consumer does not pay what is demanded, that NES' collectors are calling from a law firm, as well as engaging in abusive and untoward conduct such as screaming and hanging up on consumers.

**FACTUAL ALLEGATIONS**

11. Kristin allegedly incurred a financial obligation that was primarily for personal, family or household purposes, that went into default for late payment, and is therefore a "debt" as that term is defined by 15 U.S.C. § 1692a(5).

12. On January 11, 2007, Kristin had an eye appointment with Dr. Jesse Mantel & Associates. She was seen by Dr. Mantel's associate, Dr. Rose.

13. Kristin was told that she needed new contacts and glasses.

14. She was informed that Dr. Mantel did not accept VSP Eye Insurance, but she could open up a credit card with GE Money Bank/Lenscrafters.

15. Kristin opened up the credit card and charged the appointment and contacts, which totaled $367.00. Out of that $367.00, Kristin was charged $280.00 for the contact lenses.

16. The following day, Kristin's mom phoned Dr. Mantel's office and cancelled the contacts.

17. On January 29, 2007, Kristin received the contacts in the mail. According to the packing slip, the contacts were ordered January 19, 2007; one week after Kristin's mom cancelled the order.

18. On January 31, 2007, Kristin's mom returned the contacts and Dr. Mantel received them on February 8, 2007.

19. That same day, Kristin's mom called Dr. Mantel's office to follow up. The receptionist said she would have the office manager return the call.

20. When nobody called, Kristin's mom called the office in March 2007. She was told that the contacts were received, but that it may take a while for the credit to show up on Kristin's credit card statement.

21. In May 2007, the interest fee grace period on the GE Money Bank card expired and finance charges were added to Kristin's account.

22. During June and July of 2007, both Kristin and her mom continued to contact Dr. Mantel's office with no resolution.

23. On July 31, 2007 Kristin filed a dispute with GE Money Bank, only to be told that the dispute period lapsed.

24. Despite canceling the order and returning the contacts, Kristin continued to get billed by GE Money Bank.

25. Kristin continued to try and resolve the matter with Dr. Mantel's office. In the meantime, on or about February 11, 2008, Kristin's alleged debt was consigned, placed or otherwise transferred by GE Money Bank to Defendant for collection, when thereafter, Kristin started receiving collection communications from Defendant's employees in an attempt to collect this alleged debt.

26. At all times relevant hereto, Defendant's employees were acting in the course and scope of their employment.

### February 18, 2008

27. At approximately 10:30 am, Kristin, while at work, received a call on her cell phone. The caller identified herself as "Crystal" and said she was calling to settle the debt from GE Money Bank/Lenscrafters.

28. The caller proceeded to tell Kristin that they were going to take her to small claims court if she didn't pay the debt. The caller also said the debt would appear on and ruin Kristin's credit report if she didn't pay by February 28, 2008.

### February 21, 2008

## First Call

29. At approximately 9:30 am, Kristin received a call from one of Defendant's employees. The caller said he was from "legal" and told Kristin that she would be sued if she did not take care of the debt.

30. Kristin asked the caller for a letter numerous times throughout the conversation, stating that she wasn't going to give out her bank information to a stranger. The caller said letters were already sent and they were not going to send another one because Kristin was trying to delay the process. The caller kept telling Kristin that if she was refusing to pay, it was going straight to the attorney.

31. When Kristin asked what company the caller worked for, he said National Enterprise Systems and that he was in their legal department.

32. The caller continued to ask Kristin what she wanted to do and did she really want this little charge of $500 to end up in court.

33. The caller told Kristin the debt was going to ruin her credit for the next 7-10 years.

34. When Kristin tried to explain the situation regarding the contact lenses, the caller began taunting her and throughout the rest of the conversation told Kristin she was playing games.

35. When Kristin said she could not pay and asked for some type of correspondence, the caller said the next thing she was going to receive was a summons, that he was through dealing with her, wished her good luck and then hung up the phone.

## Second Call

36. Shortly thereafter, the caller called back and asked Kristin if she was going to have an attorney present in court.

37. Kristin asked the caller to hold so she could excuse herself from her desk. She then asked if there was anything else she could do. The caller told her to ask mommy, daddy or grand-momma, all while telling her she was playing games.

38. At one point during the call, Kristin asked the caller not to speak to her in a harassing tone and how could he get away with talking to people like that. The caller said he wasn't in customer service and it didn't matter how he spoke to her.

39. Kristin asked if the call was being recorded. The caller said of course.

40. The caller again asked for Kristin's banking information. When she refused, the caller said ok, she was going to get sued and the call ended.

### Third Call

41. At approximately 1:30 pm, Kristin received a call from an individual identifying himself as Matthew Ross.

42. He told Kristin that he was willing to work with her. Kristin explained that she was disputing the charges. Mr. Ross said that he would put a hold on the account and extend the due date if she couldn't pay so long as Kristin provided her banking information.

43. While Mr. Ross was polite in his tone, he told Kristin that if she didn't provide her banking information, they were going to sue her, papers would be submitted the following afternoon and she would have to pay $500.00 plus $1,000.00 in court and attorney fees.

44. Mr. Ross told Kristin they could garnish her wages.

45. Scared that she was going to be sued, Kristin provided her banking information even though she disputed the debt.

## March 5, 2008

### First Call

46. At approximately 9:05 am, Matthew Ross left a message on Kristin's voice mail. Mr. Ross failed to provide the information required by 15 U.S.C. § 1692e(11).

47. At approximately 9:25 am, Shawn (Curinthos?) left a message on Kristin's voice mail. The caller failed to provide the information required by 15 U.S.C. § 1692e(11).

48. At approximately 10:32 am, Matthew Ross left a message on Kristin's voice mail. Mr. Ross failed to provide the information required by 15 U.S.C. § 1692e(11).

49. At approximately 1:09 pm, Matthew Ross left a message on Kristin's voice mail. Mr. Ross failed to provide the information required by 15 U.S.C. § 1692e(11).

50. These calls were made with the intent to harass, oppress or abuse Kristin.

### Summary

51. These calls from Defendant to Kristin are collection communications in violation of numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692d(5), 1692e, 1692e(4), 1692e(5), 1692e(10), 1692e(11), and 1692f, amongst others.

52. The above-detailed conduct by Defendant of harassing Kristin in an effort to collect this alleged debt violates numerous and multiple provisions of the FDCPA, including but not limited to all of the above mentioned provisions of the FDCPA, as well as an invasion of Kristin's privacy by an intrusion upon seclusion.

53. Kristin suffered actual damages as a result of these illegal collection communications by this Defendant in the form of anger, anxiety, emotional distress, fear, frustration, upset, humiliation, embarrassment, as well as suffering from unjustified and abusive invasions of personal privacy.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE FDCAP
### 15 U.S.C. § 1692 *et seq.*

54. Kristin incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

55. The foregoing intentional and negligent acts and omissions of Defendant constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 *et seq*.

56. As a result of Defendant's violations of the FDCPA, Kristin is entitled to actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3).

### COUNT II
### INVASION OF PRIVACY BY INTRUSION UPON SECLUSION

57. Kristin incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

58. Congress explicitly recognized a consumer's inherent right to privacy in collection matters in passing the FDCPA, when it stated as part of its findings:

**Abusive debt collection practices contribute** to the number of personal bankruptcies, to marital instability, to the loss of jobs, and **to invasions of individual privacy.**

15 U.S.C. § 1692(a) (emphasis added).

59. Congress further recognized a consumer's right to privacy in financial data in passing the Gramm Leech Bliley Act, which regulates a broad range of "financial institutions" whose definition includes debt collectors, when it states as part of its purpose:

It is the policy of the Congress that **each financial institution has an affirmative and continuing obligation to respect the privacy of its customers** and to protect the security and confidentiality of those customers's nonpublic personal information.

15 U.S.C. § 6801(a) (emphasis added).

60. Defendant intentionally and/or negligently interfered, physically or otherwise, with the solitude, seclusion and or private concerns or affairs of Kristin, namely, by repeatedly and unlawfully attempting to collect a debt thereby invading Kristin's privacy.

61. Defendant intentionally and/or negligently caused harm to Kristin's emotional well being by engaging in highly offensive conduct in the course of collecting this debt thereby invading and intruding upon Kristin's right to privacy.

62. Falsely threatening suit and garnishment of wages are examples of Defendant's conduct that violated Kristin's right to financial and other privacy.

63. Kristin has a reasonable expectation of privacy in her solitude, seclusion, and or private concerns or affairs.

64. These intrusions and invasions by Defendant occurred in a way that would be highly offensive to a reasonable person in that position.

65. Defendant's acts were done with a bad motive or with a reckless indifference to the interests of the Kristin.

66. Defendant's conduct was malicious, wanton, willful, reckless or oppressive and warrants the imposition of punitive damages.

67. As a result of such invasions of privacy, Kristin is entitled to actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Kristin prays that judgment be entered Defendant:

## COUNT I.

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

## 15 U.S.C. § 1692 et seq.

- for an award of actual damages pursuant to 15 U.S.C. § 1692k(a)(1);
- for an award of statutory damages of $1,000.00 pursuant to 15 U.S.C. §1692k(a)(2)(A); and
- for an award of costs of litigation and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3).

## COUNT II.

## INVASION OF PRIVACY BY INTRUSION UPON SECLUSION

- for an award of actual damages, including punitive damages from Defendant for the emotional distress suffered as a result of the intentional and/or negligent invasions of privacy in an amount to be determined at trial; and

- for such other and further relief as may be just and proper.

Date:

Respectfully submitted,

**JEFFREY L. SUHER, P.C.**

By: **s/Jeffrey L. Suher**
Jeffrey L. Suher, Esq.
Attorney I.D.#74924
4328 Old William Penn Highway, Suite 2J
Monroeville, PA 15146
Telephone: (412) 374-9005
Facsimile: (412) 374-0799
lawfirm@jeffcanhelp.com

**Attorney for Plaintiff**